UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JUNE ROBERTS, ANITA BRADLEY,
ELIZABETH GARDNER, STEPHEN LEE and
SUFFOLK INDEPENDENT LIVING
ORGANIZATION (SILO),

                 FINDINGS OF FACT AND
                 <u>CONCLUSIONS OF LAW</u>

      Plaintiffs,

                 CV 03-2494

  -against-             (Wexler, J.)

ROYAL ATLANTIC CORPORATION,
ROYAL ATLANTIC NORTH CORPORATION,
ROYAL ATLANTIC RESTAURANT
CORPORATION, DOUBLE K MANAGEMENT
CORPORATION, STAR DEVELOPMENT
REALTY HOLDING CORPORATION, DES
REALTY CORPORATION, OCEAN REALTY
HOLDING CORP., STEVEN KALIMNIOS,
ANTHONY KALIMNIOS and THEMISTOCLES
KALIMNIOS,

      Defendants.
------------------------------------------------------------X

APPEARANCES:

  LAW OFFICE OF MARTIN J. COLEMAN
  BY: MARTIN J. COLEMAN, ESQ.
  Attorneys for Plaintiffs
  110 Marcus Blvd., Suite 300
  Hauppauge, New York 11788

  ALAN M. KANE, ESQ.
  Attorney for Defendants
  325 Reef Road Suite 212
  Fairfield, CT 06824

WEXLER, District Judge

  This action was commenced by Plaintiffs pursuant to the Americans With Disabilities Act, 42 U.S.C. §12101 (the "ADA"). Specifically, the action is brought pursuant to Title III of

1

the ADA, which prohibits discrimination in places of public accommodation. See 42 U.S.C. §12182 (Title III). Named as defendants are various corporate entities and individuals with ownership and/or management interests in the Royal Atlantic cooperative buildings located in Montauk, New York (the "Royal Atlantic" or the "Resort").[1] Plaintiffs (with the exception of the corporate plaintiff organization) are disabled individuals who seek access to the rooms and facilities of the Resort.

A non-jury trial of Plaintiffs' claims was commenced on May 31, 2005. The parties adjourned the trial pending the completion of a report by an agreed upon architect (the "Independent Architect") who was charged with evaluating the Royal Atlantic to determine the feasability of changes to bring the property into ADA compliance. It was the hope of the parties and the court that the report of the Independent Architect would facilitate a settlement. When no settlement was reached, the non-jury trial was resumed and concluded in April of 2006. The parties have submitted their proposed findings of fact, conclusions of law and legal memoranda. The court has considered those submissions and this constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

A. <u>The Plaintiffs</u>

1. The individual plaintiffs are individuals with disabilities. Plaintiff Suffolk Independent Living Organization ("SILO") is a New York not-for-profit group the purpose of which is to advocate for disabled individuals in Suffolk County, New York.

---

[1] Also named as a defendant was the corporation controlling an adjacent restaurant. Plaintiffs have abandoned any claim for access to the restaurant.

B. <u>The Resort</u>

2. The Resort is a group of apartment units in buildings located on oceanfront property in Montauk, New York. The Resort consists of two separate residential cooperative corporations both named as defendants herein – the Royal Atlantic Corporation ("Royal Atlantic South") and the Royal Atlantic North Corporation ("Royal Atlantic North"). Royal Atlantic South consists of 98 units in 6 interconnected buildings on two floors. Royal Atlantic North consists of 39 units in 5 buildings on two floors. When referring to the two parts of the resort and its facilities collectively, the court will refer to the "Resort."

3. Owners of units in the Royal Atlantic South and Royal Atlantic North corporations are shareholders in the respective corporations and holders of proprietary leases that give them the right to occupy particular units. The court will refer herein to unit owners as "proprietary tenants."

4. Proprietary leases govern the relationship between the Resort's cooperative corporations (the "Lessor") and the proprietary tenants. Two of those leases were entered into evidence at trial and are deemed by the court to represent the typical proprietary lease entered into between the cooperative corporations and the proprietary tenants (the "Lease").

5. Pursuant to the terms of the Lease, the Lessor is responsible for keeping in good repair the buildings at the Resort, its walkways and surrounding areas. The Lessor is also required to maintain and manage the Resort's buildings and to keep the common areas clean.

6. The terms of the Lease require that proprietary tenants keep the interior of their units in good repair. Proprietary tenants are responsible for the painting and decorating of their units. Additionally, they are responsible for the maintenance, repair and replacement of plumbing, gas and heating fixtures and equipment as well as refrigerators, ranges and other appliances, exposed pipes and the fixtures to which they are connected. The responsibility of proprietary tenants ends at the walls of the units so that they are not responsible for those pipes or conduits that are within the walls of the unit but are responsible for lighting and electrical fixtures and equipment on the interior walls of the unit.

7. Proprietary tenants are required to obtain the written consent of the Lessor before making any alteration to the water, gas, plumbing, heating, air conditioning, electrical conduits, wiring or outlets in the unit.

8. The Resort is located on oceanfront property. Units are located on two floors. There is no elevator between levels and the parties agree that accessibility to the second story units is not at issue here.

9. Among the amenities made available to the proprietary tenants are outdoor swimming pools located in the center of first floor units at the Resort. The pools are located at the Royal Atlantic South and the Royal Atlantic North and are surrounded by a narrow deck.

10. Units at the Resort are appropriate for use only during the summer months. Many proprietary tenants make their units available for rental to the general public during the summer months. These units are advertised to the public on the Resort's website. The exact number of proprietary tenants who make their units

available for rental (as opposed to those who retain their units for their own personal use during the summer season) was not established at trial.

11. Units owned by the Royal Atlantic Corporation were built in the early 1970's. Each of these units consist of a total area of between 250 and 364 square feet. Included in this square footage is a bathroom and a small kitchen area with a refrigerator and stove.

12. Units owned by the Royal Atlantic North Corporation were built in the early 1980's. Each of these units consist of a total area of approximately 450 square feet. Included in this square footage is a bathroom and a small kitchen area with a refrigerator and stove.

C. The Defendants

13. Defendants Royal Atlantic Corporation and Royal Atlantic North Corporation are cooperative corporations that own the land and buildings at the Resort.

14. Defendant Double K Management Corporation ("Double K") is a management agent that, in exchange a portion of the rental income of a unit, provides services attendant to the rental. For example, Double K provides for maid and maintenance service during the rental period. Double K also acts as a sales agent for proprietary tenants, arranging for rentals when inquiry is made. The relationship between Double K and proprietary owners wishing to rent their units is governed by a management rental agreement.

15. Defendant DES Realty ("DES") is a proprietary tenant in both the Royal Atlantic Corporation and the Royal Atlantic North Corporation. When this action was commenced, DES owned certain units on the first floor of the Resort. During the

5

pendency of this action, DES sold certain of its units and all units currently owned by DES are located on the second floor of the Resort.

16. Defendant Ocean Realty Corporation ("Ocean Realty") is a proprietary tenant in both the Royal Atlantic Corporation and the Royal Atlantic North Corporation. When this action was commenced, Ocean owned certain units on the first floor of the Resort. During the pendency of this action, Ocean sold certain of its units and all units currently owned by Ocean are located on the second floor of the Resort.

17. Defendant Star Development Realty Holding Corporation ("Star") is a proprietary tenant in both the Royal Atlantic Corporation and the Royal Atlantic North Corporation. When this action was commenced, Star owned certain units on the first floor of the Resort. During the pendency of this action, Star sold certain of its units and all units currently owned by Star are located on the second floor of the Resort.

18. Defendants Steven Kalimnios and Anthony Kalimnios are proprietary tenants who have, during the entire pendency of this action, owned second floor units at the Resort.

19. Units owned by the named Defendants originated from a corporate entity known as Taukpoint Realty Corp, the corporate sponsor of the cooperatives upon their formation.

20. There is no evidence that Defendant Themistocles Kalimnios is a proprietary tenant who owns any unit in the Resort.

21. At no time during the pendency of this lawsuit have Plaintiffs asked that the sale of any units at the Resort by restrained in any way and the court has never entered

an order to that effect. Thus, there has never been any court ordered restriction on the sale of any units and the proprietary tenants have remained free to offer their units for sale in the marketplace.

D. <u>Plaintiff Steven Lee's Stay at the Resort</u>

22. Plaintiff Steven Lee ("Lee") uses a wheelchair. Lee was a guest at the Resort during the last week of June 2003. During his stay at the Resort, Lee had difficulty negotiating his wheel chair through the gravel covered parking lot. Mr. Lee had difficulty checking into the Resort because his wheelchair could not enter the office due to the presence of steps. Lee was assisted in getting to the room of a family member by a Resort employee who helped to push Mr. Lee's wheelchair through the gravel parking lot.

23. The doorway leading to the bathroom in Mr. Lee's room was not wide enough to accommodate Mr. Lee's wheelchair. Consequently, he was unable to enter the bathroom during his stay at the Resort. Since Mr. Lee uses a catheter, he required the assistance of family members in emptying his urine bottle.

24. Mr. Lee was unable to use his wheelchair to enter the pool area of the Resort.

E. <u>Accessibility Issues Addressed At Trial</u>

25. Accessibility issues addressed at trial were: (1) creating an accessible route to the Royal Atlantic South from its parking area by way of a ramp; (2) creating an accessible route to the Royal Atlantic North from its parking lot by way of a ramp; (3) configuration and modification of the parking areas at the Resort; (3) the creation of accessible parking spaces in close proximity to a ramp leading to the Royal Atlantic South without substantially limiting the number of parking spaces

or interfering with access to a cesspool; (4) the creation of accessible parking spaces in close proximity to a ramp leading to the Royal Atlantic South without substantially limiting the number of parking spaces or interfering with access to a cesspool; (5) access to the pool areas located at the Resort.

26. These accessibility issues were addressed by expert reports, direct testimony and cross examination. The court also had the benefit of plans and photographs of the Resort to aid in its assessment of the accessibility issues.

F. <u>Court's Findings As To Accessibility To the Resort From Parking Lots</u>

27. There are existing ramps leading from the parking lots to the Resort. These ramps are not ADA complaint.

28. There is no accessible route to the Royal Atlantic South because the access from the parking lot is too narrow for a wheelchair to negotiate.

29. There is no accessible route to the Royal Atlantic North because the access from the parking lot is too narrow for a wheelchair to negotiate.

30. The ramp leading to the Royal Atlantic North is not used by the general public for access to the Resort.

31. The ramp leading to the Royal Atlantic North is located near an electrical transformer. Reconfiguration of this ramp to render it ADA compliant would move the ramp closer to the electrical transformer. Plaintiff's expert did not consider the proximity of the electrical transformer when considering modifications to the ramp.

32. The Long Island Power Authority requires a five foot clearance on each side of this electrical transformer. There was no testimony that an ADA compliant ramp could also comply with the clearance requirement.

33. The parking lots for both the Royal Atlantic South and the Royal Atlantic North are gravel and unpaved. Neither parking lot has accessible parking spots. These lots are approximately 50 feet wide. The narrow nature of the parking lots requires that parking be head-on.

34. The Independent Architect expressed the opinion that the creation of an accessible parking space to the existing ramps would not ADA complaint because the concepts of "accessible parking" and "accessible route" are conditional upon each other. He also expressed the opinion that creation of accessible parking spaces would not be feasible because the small, steep and narrow nature of the parking lots would result in the loss of too many parking spots. This opinion applied to both parking lots at the Resort.

35. Plaintiffs offered testimony that the parking lots for the Resort be paved down the middle to provide an area for eased wheelchair mobility. The design for this suggestion was vague and unsupported by specific plans. Further, given the narrow nature of the parking lots, this suggestion created an unsafe condition in which cars would have to be parked too close together to allow for a safe egress from vehicles.

36. The court finds that the feasibility of creating accessible parking spaces and/or ADA compliant ramps in the Resort's parking lots was not established. The court

9

bases this finding on the expert opinion of the independent architect along with the testimony and exhibits introduced at trial.

G. <u>Court's Findings As To Accessibility to Pools</u>

37. The Independent Architect expressed the opinion that access to the pool located at the Royal Atlantic South could be accomplished by building a switchback ramp. This opinion was based upon the impression that "storage sheds" could be removed. What were assumed by the Independent Architect to be storage sheds, however, were part of a snack bar that could not be easily moved.

38. In addition to requiring the building of ramps, accessibility to the pools located at the Resort would also require installation of a wheelchair lift. Such a lift would eliminate one set of stairs used to enter the pool areas.

39. Construction of an ADA compliant ramp to allow for access to either pool area would require construction of a switch back ramp that would occupy approximately 176 square feet and would interfere with the balconies of at least three units.

40. Testimony regarding access to the pools at the Resort offered by the Plaintiffs suffered from several flaws. In particular, proposed access involved the use of public property controlled by the town of East Hampton (the "Town"). There was no evidence that the Town was ever notified of any such plan. The Town's agreement to any such modification was speculative. The plan offered by Plaintiffs also failed to take into account shifting sands, fencing requirements, interference with balconies and the impact of a large ramp on the number of people allowed by law to enter the pool area.

### H. Court's Findings as to Modifications to Units

41. Also at issue was the modification of at least some units so that they could be used by individuals using wheelchairs. Plaintiffs concede that it would be disproportionately prohibitive, from a financial point of view, to modify all first floor units at the Resort. They ask, however, that this court order that any two units be modified.

42. As noted, units at the Royal Atlantic South, built in the early 1970's, consist of a total area of between 250 and 364 square feet. Those units located at the Royal Atlantic North, built in the early 1980's, consist of a total area of approximately 450 square feet. Included in this square footage of all units is a bathroom and a small kitchen area with a refrigerator and stove.

43. Plaintiffs offered the expert report of architect Frank A. Restituto which expressed the opinion that it was readily achievable, by common construction techniques, to create wheelchair accessible rooms.

44. The renovation plans offered by Plaintiffs involved almost complete demolition of the bathroom and kitchen of the units. The renovation would extend the size of the bathroom so that it would encroach upon the area where the bed is located. The renovation would limit the size of the bed that could be placed in the living area, requiring only a double bed and not two single beds.

45. Plaintiffs' proposed renovation would also substantially alter the configuration of the kitchen. The changes proposed would reduce the size of the kitchen so that it could no longer accommodate the existing full size refrigerator and stove and would accommodate only a two coiled burner in its place.

46. Plaintiffs' proposed renovation failed to properly take into account the relation of the entry door to the interior of the unit or whether it was feasible to relocate an electrical panel.

47. The cost of Plaintiffs' proposed renovations was stated to be approximately $22,000 per unit.

48. Defendants' offered testimony that given the net income of a typical unit, it would take between six and twenty years to recoup the costs of the proposed renovations.

49. Plaintiffs proposed renovation plan also suffers because they did not specify the particular units that they wished to modify nor did they identify the proprietary owners of those units.

50. While Plaintiffs named the corporate and individual entities discussed above as defendants, all individual proprietary tenants and, in particular, those proprietary tenants whose units Plaintiffs wish to modify, were neither identified nor served.

51. The failure to name and serve those proprietary tenants whose units are sought to be modified also gave the court great pause as to its ability to order the relief sought. In view of the court's findings regarding flaws in Plaintiffs' proposed renovation plan, the court need not rule on the necessity of naming each proprietary tenant and will not rest any holding on this ground.

## CONCLUSIONS OF LAW

1. At least one Plaintiff, Stephen Lee ("Lee") established that he is a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12111(8). Lee's testimony established his difficulty maneuvering his wheelchair throughout the Resort and his difficulty in using the bathroom in his unit.

12

2. Plaintiff Lee has standing to pursue this litigation.

3. Title III prohibits discrimination against disabled individuals in the "full and equal enjoyment of the goods, services, facilities, advantages, or accommodations of any place of public accommodation . . ." 42 U.S.C. § 12182(a).

4. Places of public accommodation subject to Title III include inns, hotels and places of lodging containing at least five rooms if the operations of such entities affect interstate commerce. 42 U.S.C. § 12181(7)(A).

5. The Resort is a place of public accommodation within the meaning of Title III.

6. It is a violation of Title III to fail to design and construct ADA compliant facilities for first occupancy later than 30 months after July 26, 1990.

7. With respect to existing facilities, Title III of the ADA requires, inter alia, that places of public accommodation remove architectural and structural barriers if such removal is readily achievable. See 42 U.S.C. § 12182(b)(2)(A)(4); see 42 C.F.R. §36.304(a).

8. Title III's access requirements apply to alterations made to places of public accommodation after January 26, 1992. See 28 C.F.R. § 36.402(a). An "alteration" is defined as "a change to a place of public accommodation . . . that affects or could affect the usability of the building or facility or any part thereof." 28 C.F.R. § 36.402(b). Alterations include remodeling, renovation, rehabilitation and changes in structural parts or elements, and changes or rearrangements in the plan configuration of walls and full height partitions. 28 C.F.R. § 36.402 (b)(1). Alterations triggering compliance with Title III do not include normal

maintenance, painting, wallpapering, asbestos removal or changes to mechanical and electrical systems "unless they affect the usability of the building . . ." Id.

9. The buildings at the Resort were built prior to the effective date of Title III. There was no evidence that the Resort underwent any alteration after 1992 within the meaning of the regulations referred to above. The court therefore applies the legal standard regarding existing buildings when determining whether there has been a violation of Title III.

10. Barrier removal and alternative access requirements with respect to existing facilities are required only if meeting such requirements is readily achievable. 42 U.S.C. §12182(b)(2)(A)(iv); see Spector v. Norwegian Cruise Line, Ltd., 125 S. Ct. 2169, 2176-77 (2005).

11. "Readily achievable," within the meaning of the ADA means "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). When determining whether a modification is readily achievable, the court considers the nature and cost of the action needed and the financial impact of the proposed modification on the facility involved. See 42 U.S.C. § 12181(9)(A-D).

12. It was Plaintiffs' burden to establish that the modifications sought with respect to access to the facilities and rooms at the Resort are readily achievable. Based upon the findings of fact above, the court holds that Plaintiffs failed in this burden.

## CONCLUSION

1. Plaintiffs' claims are hereby dismissed.
2. The Clerk of the Court is directed to enter judgment in favor of the Defendants.

3. The Clerk of the Court is further directed to terminate any outstanding motions and to close the file in this case.

SO ORDERED.

                                                  LEONARD D. WEXLER
                                                  UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
        August 15, 2006